SIDLEY AUSTIN LLP
David L. Anderson (SBN 149604)
dlanderson@sidley.com
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200
Facsimile: (415) 772-7400

THE PORRAZZO LAW FIRM
Michael H. Porrazzo (SBN 121260)
mhporrazzo@porrazzolaw.com
30212 Tomas, Suite 365
Rancho Santa Margarita, CA 92688
Telephone: (949) 348-7778
Facsimile: (949) 209-3514

SIDLEY AUSTIN LLP
Gordon D. Todd*
gtodd@sidley.com
Mackenzi J.S. Ehrett*
mehrett@sidley.com
Alaric R. Smith*
alaric.smith@sidley.com
Aaron P. Haviland*
ahaviland@sidley.com
Matthew H. Simpson*
msimpson@sidley.com
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Applications for Pro Hac Vice Pending

*Attorneys for Plaintiffs CAPITAL CHRISTIAN CENTER and CAPITAL CHRISTIAN SCHOOL*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
## SACRAMENTO

| | |
|---|---|
| CAPITAL CHRISTIAN CENTER and CAPITAL CHRISTIAN SCHOOL,<br><br>       Plaintiffs,<br><br>    vs.<br><br>CALIFORNIA INTERSCHOLASTIC FEDERATION; CALIFORNIA INTERSCHOLASTIC FEDERATION, SAC-JOAQUIN EXECUTIVE COMMITTEE; MICHAEL S. GARRISON, Commissioner of California Interscholastic Federation, Sac-Joaquin Section; and KEVIN SWARTWOOD, President of California Interscholastic Federation, Sac-Joaquin Section Executive Committee,<br><br>       Defendants. | Case No.<br><br>**COMPLAINT**<br><br>Assigned to:<br><br>Date:<br>Time:<br>Place: |

279230556v.18

**COMPLAINT**

Plaintiffs Capital Christian Center and Capital Christian School (collectively, "Plaintiffs") allege as follows.

**JURISDICTION**

1.     Plaintiffs bring claims arising under the Constitution and laws of the United States, therefore this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**VENUE**

2.     A substantial portion of the events giving rise to Plaintiffs' claims occurred in Sacramento, California, thus venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

**PLAINTIFFS: CAPITAL CHRISTIAN CENTER**

**AND CAPITAL CHRISTIAN SCHOOL**

3.     Plaintiff Capital Christian Center ("the Church"), is a California corporation and adheres to the Christian faith.

4.     The Church traces its roots to an in-home prayer group that began meeting in 1916. From that humble beginning, the Church has grown into one of the largest churches on the West Coast, with weekly attendance in the thousands.

5.     The Church's core values include (1) creating environments of acceptance; (2) developing people by "equipping them to grow in their purpose"; (3) being youth minded by "develop[ing] the children and youth of our church and community," and (4) engaging in passionate outreach into the broader Sacramento community.

6.     Capital Christian School ("CCS" or "the School"), is a private school that offers Pre-K through 12th grade schooling to students of all ages and socioeconomic backgrounds, including international students. CCS provides education and opportunities for interscholastic activities to students in grades 9-12 though its operation of Capital Christian High School ("CCHS" or "the High School").

7.     The Church is the parent organization of CCS, and operates CCS as part of its religious ministry and outreach to the Sacramento community.  While the Church has the right to control and direct CCS and CCHS, neither CCS nor CCHS has any right to control the Church.

279230556v.18

8.      Like the Church, CCS adheres to an orthodox Christian faith, and has adopted a statement of faith consistent with these views.

9.      CCS is committed to strengthening its students' relationship with Jesus Christ, and does so through its teaching of a Bible-based curriculum, attendance at weekly chapel services, and a Spiritual Life Program.

10.      Since its founding in 1977, CCS has enjoyed significant growth, and now has capacity to enroll up to 1700 students each year.  CCHS has enrolled 276 students for the 2021-2022 Academic Year.

11.      Consistent with the Church's core values, CCS prioritizes setting affordable tuition rates "in order to serve our school families from different socioeconomic backgrounds." For example, the Church collects donations from church members to fund the Glen Cole Young Leaders Fund, which provides tuition scholarships to many students.  Nearly ten percent of CCHS students receive financial aid to help cover the cost of their primary education, including several student-athletes who receive athletic scholarships to attend CCHS.

12.      CCHS ministers to students and the community through its athletic program.  Like all other aspects of CCS's educational program, the athletics program is centered around the School's Christian values.  CCS athletic teams are an extension of its religious ministries.

13.      CCHS's athletic program offers students the personal mentorship and coaching that comes with a small school, while competing at a level associated with a larger school's athletic program.  This opportunity is particularly valuable for students from diverse and disadvantaged backgrounds.

14.      The CCHS athletic program includes 16 different sports, including football, golf, volleyball, cheerleading, basketball, soccer, baseball, softball, and wrestling.

15.      CCS operates six state-of-the-art athletic facilities, including a football stadium for the CCHS football team, the Capital Christian Cougars.  Because the stadium is a state-of-the-art athletic facility, the Church and CCS regularly receive inquiries about leasing it to outside groups. When the CCS athletic schedule permits, the Church routinely authorizes such leases, as well as leases of other athletic facilities.

279230556v.18

16.     CCHS graduates have gone on to attend many world-class universities including the United States Air Force Academy, California Polytechnic State University, California State Universities, Columbia University, Harvard University, Massachusetts Institute of Technology, Northwestern University, Oxford University,  University of California-Berkeley, University of California-Davis, UCLA, Biola University, California Baptist University, California Lutheran University, Hillsdale College, Point Loma Nazarene University, Pepperdine University, Trinity Western University, Westmont College, and Whitworth University, among many others.

17.     Currently, 27 CCHS alumni are playing college athletics.  Alumni have gone on to play Major League Baseball, in the National Basketball Association and National Football League, and to represent the United States at the Olympic games.

18.     A perennial playoff contender, the CCHS football program has proven one of the most successful at the school, winning several league and section championships over the past decade.  The strength of the CCHS program has resulted in its players winning a number of league MVP and 1st Team All-League honors in that time.

## DEFENDANTS: CALIFORNIA INTERSCHOLASTIC FEDERATION

19.     The California Interscholastic Federation ("CIF") is a California corporation organized under the laws of California, with its headquarters in Sacramento, California.

20.     By legislative enactment, the California Legislature recognizes CIF as the organization tasked with implementing its policies and goals for organized interscholastic sports. Cal. Educ. § 33353.  As such, CIF is organized under the California State Department of Education.

21.     Because CIF is the organization responsible for administering interscholastic athletics in all California secondary schools, enforcement of its rules constitutes "state action."  *Steffes v. Cal. Interscholastic Federation*, 176 Cal. App. 3d 739, 746 (Cal. Ct. App. 2d Dist. Div. 3, 1986); *Jones v. Cal. Interscholastic Federation*, 197 Cal. App. 3d 751, 757 (Cal. Ct. App. 2d Dist. Div. 3, 1988).

22.     CIF is sub-divided into ten semi-autonomous geographical Sections, each of which oversees interscholastic athletics for the schools lying within the Section's geographic reach.

23.     CCHS is located within CIF's Sac-Joaquin Section ("CIF-SJS"), which encompasses Sacramento.  CCHS is therefore subject to governance by the CIF-SJS.

24.     CIF-SJS is semi-autonomous from the CIF, and is governed by the CIF-SJS Executive Committee, a nine-person committee tasked with enforcing CIF-SJS rules and regulations.

25.     Defendant Michael S. Garrison is the CIF-SJS Commissioner, and is named as a Defendant both as an individual and in his capacity as Commissioner.  As the CIF-SJS Commissioner, Garrison is a member of the CIF-SJS Executive Committee.

26.     As CIF-SJS Commissioner, Defendant Garrison is authorized to interpret CIF-SJS rules and regulations, investigate possible violations of CIF-SJS rules and policies, impose sanctions on CIF-SJS member schools, and, along with the CIF-SJS Executive Committee, penalize member schools for violations of CIF or CIF-SJS rules and regulations, or for just cause.

27.     Defendant Kevin Swartwood is the President of the CIF-SJS Executive Committee, and is named as a Defendant both in that capacity and as an individual.  As CIF-SJS Executive Committee President, Defendant Swartwood serves as the chairman of the Executive Committee, and is one of the CIF-SJS representatives to the CIF Federated Counsel.

## ALLEGATIONS

### A.     INTERSCHOLASTIC SPORTS IN CALIFORNIA

28.     CIF's purpose is to adopt rules governing interscholastic high school athletics, and to establish agreed-upon minimum standards for interscholastic athletic programs.

29.     CIF membership is only available to California public, charter, and private high schools. CIF membership is not available to non-California public, charter, and private high schools. CIF lacks governing authority over non-CIF members.  By contrast, CIF enjoys monopolistic and non-accountable power over its member schools.

30.     CCHS is a CIF member.  Because of its Sacramento location, CCHS falls under the jurisdiction of the CIF-SJS.

31.     Within CIF-SJS, member schools participate in a wide variety of sports across a variety of leagues, all subject to CIF's and CIF-SJS's jurisdiction.  CCHS's football program competes in the Capital Athletic League, which operates under the supervision of CIF-SJS and includes both public and private schools.

32.     CIF and CIF-SJS regulate their members' athletic activities through their bylaws,

which cover a wide range of subjects including, *inter alia*, Standards of Eligibility (CIF Bylaw 201), Age Requirements (CIF Bylaw 203), Residential Eligibility (CIF Bylaw 206), and students' Transfer Eligibility (CIF Bylaw 207).  CIF enjoys total dictatorial control over its member schools.  That is to say, CIF is the only game in town—any school that wishes to participate in interscholastic athletics *must* join the CIF and agree to abide by CIF's rules.

33.    In addition to promulgating umbrella bylaws which apply to all interscholastic athletic competitions, CIF and CIF-SJS promulgate sports-specific bylaws, including bylaws pertaining to interscholastic football.

34.    Defendants' football bylaws include detailed regulations about mandatory student conditioning, permissible and prohibited activities occurring during practice days, game scheduling, division organization and playoffs, and season dates.

35.    Although the CIF and CIF-SJS bylaws specifically circumscribe the conditions under which a CIF member's football teams may practice, scrimmage, and compete against other CIF member's football teams, no bylaw purports to govern football games between football teams that are not members of CIF.  To the contrary, CIF Bylaw 502 requires CIF member schools to compete only with other CIF member schools, or with schools that are members of a corresponding state's high school athletic association.

36.    Neither CIF nor CIF-SJS otherwise purports to regulate the administration or playing of non-school sponsored high school club sports.  As noted, CIF Bylaw 502 prohibits a CIF-member's organized sports team from scrimmaging or playing a non-CIF member club sports team, but is otherwise silent as to the administration or playing of athletic games between two non-CIF member teams.

37.    Club sports for high school-aged athletes are increasingly prevalent in many sports, often operating in parallel to, and sometimes supplanting, high school team sports.

38.    Club Sports are sponsored by a variety of organizations and leagues.  Among the most prominent are the American Athletic Union (AAU) and the American Legion, which organize club leagues and teams across a wide range of sports and across the nation.  Pop Warner Football and American Youth Football support club football teams and leagues specifically.

39.     Club sports offer high school athletes the ability to compete year-round in their sport of choice, often at a higher level of competition than offered by their high school league.  For many student athletes, club sports offer a higher level of skill development, greater exposure, an opportunity for college or professional recruitment, and an increased likelihood of receiving an athletic scholarship.  Thus, athletes in certain sports—such as basketball, baseball/softball, soccer, and volleyball—will compete for both their high school team and a club team.

40.     Club teams are not tied to any particular school.  Rather, club teams draw participants from a range of diverse backgrounds and are more typically organized by geography, age, and skill level.  Accordingly, club athletic teams comprised of high school aged students most often feature student athletes from more than one high school high schools.

41.     Nonetheless, it is not unusual for a club team to overlap with a particular school's sports teams.  Athletes from a particular high school athletics program may also play for the same club team.  So too for coaches.  But this overlap does not transform the separately organized, funded, and directed club team into the high school's team.

42.     Because they are independent from public and private schools, club teams generally are less well funded and have less, if any, equipment or facilities. Accordingly, club teams commonly lease athletic facilities and athletic equipment from public and private high schools

43.     CIF imposes minimal restrictions on student-athletes' participation in club sports programs:  a student-athlete is ineligible for CIF competition if he or she competes in a contest for an outside team in the same sport during the season designated for that sport by CIF.  For example, an athlete found to compete for both a club soccer team and her high school soccer during the winter (CIF-SJS's designated soccer season) would be ineligible.  However, an athlete who competed for a club team in the fall would be eligible to play for her high school that winter.

44.     Like many student-athletes in California, a number of CCHS students participate in both CCHS and club sports.  Prior to the events giving rise to this lawsuit, neither CIF nor CIF-SJS ever purported to prohibit CCHS student athletes from participating in club sports or to regulate or prohibit club sports leagues.

45.     CIF-SJS's bylaws recognize that club team participation may overlap with CIF-

member school teams.  The by-laws define a "team associated with a school" as one "that is organized by and/or coached by any member of the coaching staff at, or any other person associated with that school; and/or, on which the majority of the members of the team . . . are students who attend that school."  CIF-SJS Bylaw 510.E(1).  And, CIF-SJS restricts student-athlete's ability to transfer from one high school to another where the transferring student "participates or participated . . . on a non-school athletic team (*i.e.*, AAU, American Legion, club team, etc.) . . . that is associated with the new school."  *Id.*  On their face, these regulations recognize that "a team associated with a school" – *i.e.*, a Club Team – is a "non-school athletic team," – *i.e.*, not the CIF-member school's own team.

46.  CIF-SJS bylaws state further that "[a]ll out-of-season activities sponsored by an agency not under the authority of the State CIF or of the Section"—such as "regional or national athletic organizations" like the AAU are exempt from CIF prohibition on out-of-season activities other than weightlifting and conditioning.  *See* CIF-SJS Bylaw 504.7.

47.  Thus, to the extent CIF-SJS has sanctioned club teams "associated with a school" for non-CIF competition, CIF-SJS based its decision on that team's failure to "associate with an outside agency."  For example, CIF-SJS imposed sanctions on Bret Harte High School's baseball team, a public school program, for "participating in a fall baseball league without affiliating with an outside agency."  For this violation, CIF-SJS imposed minor sanctions amounting to the loss of six practices the following spring and probation.

**B.    CALIFORNIA INTERSCHOLASTIC SPORTS COVID SHUTDOWN AND THE LAUNCH OF CLUB FOOTBALL LEAGUE.**

48.  In March 2020, California Governor Gavin Newsom issued a state-wide shutdown and stay-at-home order in response to the COVID-19 pandemic.  The order required all California residents to heed any orders issued by state and local public health officials.  Soon thereafter, the California Department of Public Health and the Sacramento County Health Officer issued orders and guidance that effectively suspended high school sports in California.

49.  As the pandemic and lockdowns continued, parents across the state, including in the Sacramento community, began to notice the many negative effects that the shutdown was having on

their children.  As has now been studied and widely reported in the press, removal of students from all social, educational, and extracurricular activities and interactions propagated generally worsening academic performance along with increased incidents of depression, drug use, alcohol abuse, and suicidal tendencies.  Parents in Sacramento noted these same trends.

50.     A group of concerned parents and high school coaches in Sacramento began discussing these problems and possible solutions.  One suggested remedial measure was club sports.

51.     In the absence of high school sports, *ad hoc* club sports leagues had already started to form around California.  These leagues lacked any regulation, responsible oversight, insurance, certified safety equipment, or any other safeguards that would normally be expected of a club athletic program.

52.     The concerned parents and coaches recognized the benefits that club sports could offer students, but were concerned with their loose structure and desired better oversight and regulation to ensure the safety of student athletes.  With these considerations in mind, they began to hold regular, informal meetings to explore the formation of an official club league.

53.     From the start, a central concern was to structure a club league that was fully consistent with CIF rules.  The coaches and parents carefully reviewed the CIF bylaws to ensure compliance.  They also communicated regularly with Commissioner Garrison and other CIF representatives.

54.     The coaches and parents organized a 501(c)(3) organization—the California Association of Private Sports ("CAPS")—to oversee the club league.  Phil Grams, the head football coach at Ripon Christian School, was appointed as the president.

55.     CAPS was developed on a "community" team model, common in club sports, where teams represent a particular geographic area rather than a particular school.  CAPS developed a detailed sign-up process for participation in the club league, including requiring fees, insurance, and COVID waivers.

56.     Club teams began to form to participate in the CAPS league.  Participants went through a formal sign-up procedure, which included safety waivers, insurance, and fees.  Teams ultimately enrolled diverse rosters of students from public, private, and parochial schools.

57.     CAPS received applications from 20 teams to participate in the club football league. The league initially formed with eleven charter members:  (1) the Bakersfield Elite Bandits Football Club, (2) the Cap City Cougars, (3) Castle Student Athletic Academy, (4) Coastal Wahoo Youth Sports, (5) Knights Outdoor Fitness & Skillz Academy, (6) the Modesto Renegades, (7) the PAL 19u North Bay Football Club, (8) the Raider Athletic Club, (9) the Reaching Higher Cavs, (10) the Sonoma Express, and (11) the West City Warriors.  CAPS members could field teams in two divisions:  one for players aged 16-years-old and under ("U-16") and one for players 19-years-old and younger ("U-19").  These divisions mirrored those found in the Amateur Athletic Union of the United States ("AAU"), and other club sports leagues, across the country.

58.     The makeup of the league remained in flux as the season approached.  After initially committing to play, teams such as the Raider Athletic Club dropped out of the league; however, three more teams were added:  the Solano-Yolo Rugby Club, the Misfits, and the Wild Dawgs.

59.     Unsurprisingly, many teams had substantial numbers of participants who attended or coached at the same schools.  The Cap City Cougars, for example, fielded both U-16 and U-19 teams.  The U-16 team consisted of 35 athletes, 22 of whom were students at CCHS.  The U-19 team consisted of 34 athletes, 14 of whom were students at CCHS.  Many of Cap City's U-19 players were then-seniors at Sacramento area public high schools, and hoped to impress college coaches before graduation, so that they could play at the college level.  With almost half of its athletes hailing from schools other than CCHS, Cap City was one of the most diverse clubs in the CAPS league.  In addition, Cap City's 17-man coaching staff included only two coaches who had previously coached for CCHS.  Both coaches had children playing for the club.

60.     Other league teams had similar, if not larger, contingents of players from a single school.  On the Misfits, more than 90% of the players attended  either Elk Grove High School or Grant Union High School ("Grant")—both public high schools in the Sacramento area.  So too was the Misfits' coaching staff comprised of several of Grant's coaches.  The Wild Dawgs, a late addition to the CAPS league, were similarly made up of mostly public school students from Hughson High School, with  Hughson's head football coach serving in the same capacity for the club team.

61.     As with most club leagues and teams, CAPS did not own its own facilities. On account of the COVID shutdown, public facilities were not available for lease.  Accordingly, CAPS approached several organizations, including the Church, about leasing field space to host club football games.

62.     The Church welcomed the opportunity, which was fully consistent with its long history of leasing CHS facilities—including the football stadium, gym, baseball field, other facilities, and sports equipment—to outside entities, including club teams affiliated with AAU and Pop Warner football.

63.     On January 25, 2021, CAPS and Cap City signed lease agreements for equipment and facilities with the Church and CCS.  The facilities lease authorized CAPS to use the stadium and restrooms for league games.  The lease also permitted Cap City to use the stadium, restrooms, and locker rooms on a weekly basis for practices.  The lease, which ran from January 25, 2021, to April 24, 2021, cost CAPS and Cap City $1,500.  The terms and costs included in the lease signed by Cap City were commensurate with facility leases executed between CCS and third parties prior to the pandemic.

64.     CAPS and the teams in the league executed similar leases with at least three other schools:  Ripon Christian High School, Stone Ridge Christian High School, and Vacaville Christian High School.  CAPS intended to use the four facilities to host all of the games for the CAPS league.

65.     Cap City's lease agreement with CCS also permitted it to use CCS's football helmets, pads, and field equipment at a cost of $500 for the period beginning January 25, 2021, and ending May 1, 2021.  This lease was consistent with leases that AAU teams commonly execute with schools to use school-owned athletic equipment.  Other teams in the league, including those with public school players and coaches, similarly leased equipment from schools unable to field football programs.  Some took a more creative approach. Upon information and belief, the Misfits purchased new equipment, which it later sold to Grant Public High School when the CAPS season concluded.

66.     The CAPS league kicked off with a doubleheader of games on Friday, February 12th.  That night, Cap City defeated the Bakersfield Elite Bandits in a U-19 matchup held at Capital Christian.  Two hours south at Stone Ridge Christian, the Sonoma Express ("Sonoma") U-19 team

1   walked away with a victory over the Castle Student Athletic Academy ("Castle").  Four more games

2   were held the next day:  a U-19 matchup at Capital Christian between the Misfits and West City

3   Warriors (the "Warriors"), a U-16 game between Cap City and Castle, and both U-16 and U-19

4   games between the Coastal Wahoo Youth Sports (the "Wahoos") and the Reaching Higher Cavs (the

5   "Cavs").

6          67.     The next weekend, nine games were played across Friday and Saturday with Cap

7   City, the Wahoos, the Cavs, Solo Rugby, Sonoma, Castle, Knights Elite Skillz Academy (the

8   "Knights"), North Bay, and the Wild Dawgs playing in games at all four sites leased by CAPS.  The

9   league held eight more games the next week, on February 26 and 27.

10         68.     By the fourth week of the planned club season—the weekend of March 5 and 6—it

11  began to appear as though CIF would permit a shortened spring high school football season.  Only

12  six more CAPS league games took place after that date, with the Cavs, Knights, Castle, and Solo

13  Rugby playing.  In contrast, Cap City did not play another game after it played the Misfits on

14  February 26.

15  **C.     CIF-SJS AND COMMISSIONER GARRISON COLLUDE WITH COMPETITOR
        SCHOOLS TO DISCRIMINATE AGAINST CCS AND OTHER CHRISTIAN
16      SCHOOLS.**

17         69.     Despite widespread participation in the league by students from public, private, and

18  parochial schools, Commissioner Garrison from the start evinced a special interest in CCHS.  On

19  February 8, 2021, shortly before the start of the CAPS season, Garrison emailed CCS Head of

20  School Tim Wong and CCHS Principal Erick Streelman, demanding copies of the facilities lease

21  contract between Capital City and CCS, as well as any supporting documentation.  He asserted that

22  he had learned of the contracts from his conversations with Aaron Garcia, the head of the CCS

23  athletic department.  According to Garrison, "the whole club football situation has created quiet [sic]

24  the stir within our Section's membership as well as the CIF as a whole."  Wong referred Garrison to

25  CCS's chief operating officer, who handled leasing agreements with outside organizations, for

26  further information.

27         70.     Garrison followed up with Streelman by letter shortly thereafter to formally assert

28  that he had learned that CCHS's "football team is scheduled to compete in competitive football

1   contest(s)."  Garrison threatened CCHS with potential sanctions pursuant to CIF Article 22,

2   including fines, suspension, or dismissal from membership.  Upon information and belief, Garrison

3   did not send a similar letter, or make similar threats, against secular school programs with students

4   participating in the CAPS League.

5           71.     On February 10, CIF issued a statewide media release in anticipation of a potential

6   spring season for high school sports.  In the release, CIF announced it would waive CIF Bylaws 600-

7   605, which restrict athletes' same-season participation on non-interscholastic teams, for the spring

8   season.  Although CIF clarified the exemption would not apply to football and that athletes could not

9   *simultaneously* compete for club and high school football teams, it specified that a student would not

10  violate its rules "until they participate in a high school football game *and subsequently* participate in

11  a club football game."  *See* https://cifstate.org/covid-19/2.12.21_update_re_600 (emphasis added).

12          72.     Streelman and Wong endeavored to correct Garrison's understanding about the nature

13  of the Cap City team.  On the night he received Garrison's letter, Streelman replied to Garrison to

14  note that the games scheduled were not school events and that the team contained players from a

15  variety of schools.  Wong repeatedly attempted to contact Garrison to seek clarity on what

16  specifically Garrison thought might violate CIF rules, as well as his definition of "club football," but

17  Wong's outreach was met with deafening silence.

18          73.     Garrison made no attempt to engage Streelman to attempt to resolve the points of

19  disagreement.  Instead, Garrison merely reasserted that CCHS ran the risk of sanctions and that his

20  assessment of the character of any team may not mirror CCHS's view.  Despite offering to speak by

21  phone, Garrison did not return Wong's call on February 12—the day of the first CAPS league

22  games.  That evening, Garrison sat in an elementary school parking lot neighboring CCS to secretly

23  observe Cap City's opening day contest.  But Garrison made no investigation into the nature of the

24  Cap City team that evening beyond what he could observe from afar.

25          74.     On February 22, 2021, Garrison wrote to Streelman, informing him that CIF-SJS was

26  aware of the club football games that had been played on CCS's campus on February 12th, 19th, and

27  20th, and that Cap City's roster included CCHS students and coaches.  Garrison asserted that

28  CCHS's purported involvement in the club football league was a potential violation of CIF Bylaw 22

and CIF-SJS Bylaw 105.  He demanded that Streelman provide him with the identities of the CCHS students and coaches involved in Cap City, as well as the specific facilities and equipment that CCS had leased to Cap City, by March 2, 2021.

75.     Plaintiffs are not aware of Garrison making similarly invasive inquiries into and threats against all other, or even some other, schools whose students and coaches participated in the CAPS league.

76.     In late February 2021, Capital Athletic League representatives met to discuss the schedule for the upcoming spring season.  Capital Christian, however, was the lone school not invited to that meeting.

77.     During the meeting, the attendees discussed CIF-SJS's allegations that Capital Christian had violated Sacramento County Health Guidelines for sports, and discussed removing Capital Christian from the schedule for the upcoming season.

78.     On March 1, 2021, Greg Snyder, the principal of Del Campo High School and the president of the Capital Athletic League, sent an email to Wong, Streelman, and Garcia informing them about the meeting. He asserted that the school principals in attendance had voted unanimously not to play Capital Christian for the 2020–21 school year.

79.     Streelman responded to Snyder's email the next day.  He explained that Snyder and the other principals in the Capital Athletic League appeared to be operating on "skewed information" because Capital Christian has not participated in any football practices or games.

80.     Snyder replied that the Capital Athletic League principals were "going to stick with [their] decision" because "Capital Christian participated in football games within Sacramento County during an order that does not allow for close-contact sports. They used their field, some of their equipment, some of their players (80%), and some of their coaches (at least 3)."

81.     On information and belief, the Capital Athletic League, however, did not take similar action against any public school programs whose players and coaches participated in the CAPS league.

82.     On March 4, 2021, Mark Golston, the commissioner of the Capital Athletic League, emailed the league athletic directors with a revised schedule that included CCHS.  Snyder was


copied on the email.  Golston told the athletic directors: "I, as the commissioner, encourage you to play Capital Christian, as they are part of the Capital Athletic League.  Our [sic] at least, have a conversation with them about the game.  If you should choose not to play them, please let them know ahead of time, so as both Capital and you can find another team to play."

83.    Eight minutes after Golston sent his email, Snyder sent another email to all of the athletic directors except for Aaron Garcia, the athletic director of CCS.  Snyder explained that the email was "[o]ff the record" because Golston was "staying neutral as commissioner."  In the text of the email, he forwarded a copy of a message he had recently sent to the principals of Capital Athletic League schools in which he relayed Garrison's determination that no school would be required to play Capital Christian but that the league should refrain from removing Capital Christian from the schedule "for legal reasons."

84.    Garrison did not make similar comments to teams in the leagues containing Elk Grove, Grant, and Hughson—three public high schools whose teams participated in the CAPS league.

85.    Ultimately, the CCHS football team competed in three CIF-sanctioned, but non-CAL league games that spring:  on April 2 against Edison High School, April 9 against Center High School, and on April 16 against Grant High School.  In contrast, other teams within the CAL league contested both league and non-league games.

**D.    CIF-SJS PENALIZES ONLY CHRISTIAN PARTICIPANTS IN THE CAPS LEAGUE.**

86.    On June 2, 2021, Garrison sent a letter to CCS notifying it that the CIF-SJS Executive Committee would be meeting on June 17, 2021, to discuss whether CCS had violated CIF bylaws by participating in a private football league and, if so, whether it should be subject to sanctions.  A representative of Capital Christian would have the opportunity to address the Executive Committee during public comment at the beginning of the meeting, before the Executive Committee went into closed session to deliberate.

87.    CIF-SJS published an agenda for the Executive Committee meeting shortly thereafter. The first item on the "Closed Session" portion of the agenda noted that the Commissioner and the

1   Executive Committee would discuss "whether [certain] CIF-SJS member schools . . . participated in

2   private club football in violation of CIF Bylaws 105, 504(A & L), 502(A & B, Article 22 and

3   whether sanctions should be imposed."  The agenda listed eight schools other than CCHS for

4   "discussion," including public schools such as Hughson and Grant, as well as each school's alleged

5   affiliation to a CAPS League team.  The agenda included no other indication of the evidence that

6   would be presented against each school.

7          88.     On June 16, 2021, the day before the CIF-SJS Executive Committee meeting,

8   Garrison sent Wong the information packet that he would be presenting to the Committee, which

9   included the factual findings and conclusions of his investigation into CCS.  At that time—before

10  CCHS had been afforded an opportunity to address the allegations in a formal hearing—Garrison

11  had concluded that the CCHS "football team as the Cap City Club Football team, competed in

12  football games in contravention of CIF Bylaws 22 and 105."  Moreover, Garrison concluded that

13  CCHS competed in football competitions during the months of February 2021 in violation of the

14  CDPH guidance" and "competed in two seasons of the sport of football" during the Winter and

15  Spring of 2021, in violation of CIF-SJS rules and regulations.

16         89.     That evening, Wong drafted a response to Garrison's allegations that corrected

17  numerous factual errors and noted the lack of due process, transparency, and accountability in the

18  administrative process.  Wong also requested that Garrison permit adequate time for a formal

19  response from CCHS that would allow the Executive Committee to make an informed decision on

20  the matter.  Garrison ignored this request.

21         90.     Garrison and the Executive Committee met on June 17, 2021.  At no point did the

22  committee offer CCHS a formal opportunity to address and rebut the allegations contained in

23  Garrison's information packet.  Instead, CCHS was permitted only to address the committee during a

24  short public comment session—along with any other member of the public—before the Executive

25  Committee met in a closed session.  In addition to Wong and Garcia, representatives from Woodland

26  Christian, Hughson, Vacaville Christian, and Ripon Christian made statements during the public

27  comment portion of the meeting denying allegations of any wrongdoing.  The Committee did not

28  disclose the results of their closed-session meeting that day; nor do the meeting minutes reflect any

1    discussion by the Executive Committee on the allegations against each school.

2        91.    On July 29, 2021, CIF-SJS issued a formal Summary of Decision / Findings—

3    authored by Garrison—finding that CCHS had violated Article 2, Section 22 of the CIF Constitution,

4    which requires CIF's member schools follow CIF's rules and regulations, and CIF Bylaws 105 and

5    502.  Garrison based this conclusions on a limited number of facts, including his own finding that

6    that: (i)  more that 50% of Cap City's players were student-athletes at CCHS; (ii) that 60-75% of the

7    Cap City coaching staff were CCHS coaches; (iii) that Cap City players entered a game through an

8    inflatable cougar head, which was traditionally used by CCHS,  followed by a tunnel of

9    cheerleaders; and (iv) that Cap City rented its equipment and facilities from Plaintiffs.

10       92.    Garrison further clarified that it was "within [his] authority and discretion" alone "to

11   determine the appropriate penalties" for CCHS's purported violations.  Although Garrison concluded

12   that CCHS's purported violations warranted "the most severe of sanctions (suspension of

13   membership), he declined to impose such a sanction "only because of  the exemplary standing" of

14   CCS.  Garrison instead exercised his to discretion by imposing a supposedly less serious set of

15   sanctions, including:  (a) a two season ban from postseason play for the 2021-22 and 2022-23 season

16   for CCHS's football program;  (b) a three year probationary period for the football program through

17   the end of  2023-24 school year; and (c) a one year probationary period for the entire CCHS athletic

18   program, through the end of the 2021-22 school year.

19       93.    Garrison's decision additionally cautioned CCHS that any further violation during its

20   probationary period might result in the full suspension of CCHS' membership in CIF-SJS.

21       94.    That same day, CIF-SJS issued a press release announcing similar bans for three other

22   Christian high schools—Ripon Christian, Stone Ridge Christian, and Vacaville Christian—whose

23   players participated in club football.  That press release noted that "[a]fter a comprehensive and

24   thorough review of the football activities that several CIF-SJS member schools engaged in during

25   the months of February 2021 and March 2021, it was determined that four (4) of the 150 CIF-SJS

26   member schools that participate in football, CIF-SJS member schools participated in the sport of

27   football when interscholastic football competition was prohibited by CIF and CIF-SJS bylaws and

28   State orders, regulations, and guidance."  *See* https://cifsjs.org/announcements/2021-

1   22/SJSPressReleaseJuly29.pdf (emphasis added).

2   95.   The release also quoted Garrison as saying:  "We have approximately 150 member

3   schools, within the CIF-SJS and the vast majority of them held off until given the go-ahead to

4   participate in football.  Unfortunately, a few schools after being put on notice by the Section, that

5   participation in football would be a violation of guidance provided by the Governor's office, the

6   CDPH, and CDE, elected to participate in football contests while wearing school uniforms, using

7   school equipment and school facilities under the supervision of team coaches."  *Id.* (emphasis

8   added).

9   96.   CIF-SJS did not issue any similar sanction against a public high school, including

10   those whose students and coaches participated in the CAPS league.

11   97.   CCHS sought an appeal of CIF-SJS's decision on August 11, 2011.  Garrison

12   subsequently appointed a three person panel to hear CCHS's challenge to Garrison's imposition of

13   sanctions.

14   98.   The appeal panel upheld Defendants' findings and Garrison's imposition of sanctions

15   for the reasons cited in the earlier Summary of Findings.  The appeals panel concluded CCHS's

16   willfulness was demonstrated by the fact that "[o]f the 150 CIF-SJS member schools that participate

17   in football, only four, including CCHS failed to comply with the January 19, 2021 CIF State Office

18   letter."  Yet, the appeals panel was never presented with evidence of the other 146 member schools'

19   compliance with the directive.  On information and belief, despite the participation of substantial

20   numbers of public school athletes, Defendants investigated only the four Christian schools

21   sanctioned.

22   99.   The panel similarly cited "the high level of involvement of CCHS coaches, student-

23   athletes, administrators as well as the written agreements between Cap City and CCHS for the use of

24   CCHS's facilities, including the locker room and CCHS's football equipment to Cap City" as

25   evidence of CCHS's malfeasance.  The appeals panel, however, did not consider similar, if not

26   greater, levels of involvement by public and secular, private school athletes on other teams, nor

27   similar facility agreements between such schools and club football teams in the CAPS league.

28   100.   Before the CIF Appeals panel rendered its decision, the Church filed suit in the

California Superior Court for the County of Sacramento, seeking a writ of mandamus setting aside Defendants' sanctions against CCHS, injunctive relief regarding the process by which Defendants imposed its unlawful sanctions.

101.   The Superior Court denied CCHS's request for injunctive relief, finding that CCHS was unlikely to prevail on the merits because CCHS had availed itself of the CIF Appeals process, thereby receiving all of the process to which it was due.  CCHS voluntarily dismissed that action on April 25, 2022, before any final judgment on the merits was rendered.

## DAMAGES

102.   As a result of the discriminatory sanctions, Plaintiffs have suffered, and will continue to suffer substantial reputational harm.  Defendants' findings and penalties effectively brand CCHS as "cheaters" in contrast to their prior "exemplary standing."  Plaintiffs' standing in the community has been significantly damaged which impacts their ability to fulfill their educational and religious missions.  Such damages are unquantifiable.

103.   Plaintiffs have also suffered significant monetary harm as a result of the CIF sanctions.  Without the opportunity to field a football team capable of playing in the CIF-SJS postseason, a number of student athletes haven chosen  to enroll at schools not subject to similar restrictions.  Unlike most private educational institutions which saw a sharp uptick in applications and enrollment from students seeking in-person education while many public schools were taking place remotely, enrollment at CCHS has dropped significantly as a result of the sanctions imposed by CIF-SJS.  As a result, CCHS has lost, and will continue to lose, tuition revenue, which negatively impacts its ability to carry out its Christian mission of providing low-cost education.

104.   Additionally, plaintiff has already lost and will continue to lose significant revenue from the sanctions imposed by CIF-SJS, including  revenue generated by ticket sales, promotions, and concessions at CCHS football games.

## CAUSES OF ACTION

### COUNT 1 – EQUAL PROTECTION – DISPARATE TREATMENT
#### U.S. Constitution, 14th Amendment
#### 42 U.S.C. § 1983

105.   The Church and CCS incorporate the preceding paragraphs as though set forth fully

herein.

106.   As a Christian school, CCS is a member of a protected class, and is constitutionally shielded from adverse treatment on the basis of its religious beliefs.

107.   Although thirteen teams participated in the CAPS league—comprising students who attended numerous different public and private schools—Defendants singled out only Christian schools—CCHS, Ripon Christian, Stone Ridge Christian, and Vacaville Christian—for sanctions.

108.   Contrary to CIF-SJS's claim that the "vast majority" of schools complied with CIF-SJS's directives during the pandemic, CIF-SJS had no factual basis for this assertion.  CIF-SJS and Garrison investigated only the conduct of Christian schools, despite similar conduct by both public and secular, private high schools.

109.   Among the teams that participated in the CAPS club football league, several teams maintained rosters where more than 50% of the players attended a single high school.  CIF-SJS, however, investigated and prosecuted only Christian high schools for purportedly violating CIF-SJS bylaws.  On information and belief, neither CIF-SJS nor Garrison conducted any investigation into the same conduct by public or secular private schools.

110.   Several teams within the CAPS league also utilized equipment, uniforms, and facilities supplied by, or later provided to, public or secular, private high schools.  Again, neither CIF-SJS nor Garrison investigated or targeted these high school programs for this conduct.

111.   Because no investigation was conducted into the conduct of any school other than CCHS, Ripon Christian, Stone Ridge Christian, and Vacaville Christian, Defendants had no basis to conclude that every other CIF-SJS member school complied with CIF bylaws during the COVID-19 pandemic.

112.   Of the thirteen teams involved in the inaugural CAPS club football league season, CIF-SJS and Garrison investigated only those with a tangible affiliation to a Christian school.  Defendants, however, willfully ignored any potential affiliation between public or secular, private schools and the remaining teams in the CAPS league.

113.   Defendants' novel and unprecedented interpretation of their bylaws as regulating club sport activities and singling out Christian schools and their students for sanctions pursuant to that

interpretation is evidence of Defendants' intent and purpose to discriminate on the basis of religion.

114.    Defendants' conduct violates the United States Constitution's guarantee of equal protection to Plaintiffs, because Defendants' sanctions discriminated on an improper basis, religious affiliation.

115.    As a result of Defendants' discriminatory and unlawful conduct, Christian student athletes who attend CCHS are now subject to sanctions and penalties. In particular: (a) CCHS students who participated on the Cap City teams, are now subject to Defendants' sanctions, while their Cap City teammates who were not CCHS students are not; and (b) CCHS students who had no involvement with the Cap City club league whatsoever are subject to Defendants' discriminatory and unconstitutional sanctions.

116.    Defendants' patchwork method of imposing sanctions against the Christian schools participating in the CAPS Club League results in disparate treatment because the Christian schools are penalized while non-Christian schools who engaged in similar activity—i.e., their students and coaches participated in the CAPS League—are not subject to any sanction or penalty.

117.    As a result of Defendants' discriminatory, unconstitutional, and otherwise unlawful Christian student penalties, CCS and its students have suffered significant financial and reputational damages in an amount to be proved at trial.

### COUNT 2 – EQUAL PROTECTION – SELECTIVE ENFORCEMENT
#### U.S. Constitution, 14th Amendment
#### 42 U.S.C. § 1983

118.    At all times, the Cap City football teams were separate and distinct from CCHS. Nevertheless, Defendants unlawfully decided to impose sanctions on CCHS and three other Christian schools, while declining to sanction the other public schools whose students and coaches participated in the CAPS league.

119.    Even if Defendants were within their rights to impose sanctions upon coaches and students who participated in the CAPS league—a position which Plaintiffs dispute—Defendants' discriminatory purpose in selectively penalizing CAPS league students was made apparent when Defendants handed down sanctions on Christian schools as a whole, and not individual athletes.

120.    The clear effect of Defendants' selective enforcement actions was to impose penalties

on religious schools, while similarly situated schools whose students and coaches participated in the CAPS league were not subject to any penalty for identical behavior.

121.    As a result of Defendants' discriminatory and selective enforcement, CCS has suffered significant financial and reputational damages, in an amount to be proved at trial.

### COUNT 3 – VIOLATION OF THE FREE EXERCISE CLAUSE
### U.S. Constitution, 1st and 14th Amendments
### 42 U.S.C. § 1983

122.    The First Amendment, made applicable to the States through the Fourteenth Amendment, prohibits any law abridging the free exercise of religion.

123.    A state action that discriminates on the basis of religion is subject to strict scrutiny, and must be invalidated unless it is "justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

124.    State action discriminates on the basis of religion "whenever [it] treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

125.    Here, Defendants have selectively targeted Christian high school football programs for punishment despite comparable conduct by secular programs.

126.    Although thirteen teams participated in the CAPS league—comprising students who attended numerous different public and private schools—Defendants singled out only Christian schools—CCHS, Ripon Christian, Stone Ridge Christian, and Vacaville Christian—for sanctions.

127.    Contrary to CIF-SJS's claim that the "vast majority" of schools complied with CIF-SJS's directives during the pandemic, CIF-SJS had no factual basis for this assertion.  CIF-SJS and Garrison investigated only the conduct of Christian schools despite similar and more egregious conduct by both public and secular, private high schools.

128.    Among the teams that participated in the CAPS club football league, several teams maintained rosters where more than 50% of the players attended a single high school.  CIF-SJS, however, investigated only Christian high schools for purported violations of CIF-SJS bylaws.  On

information and belief, neither CIF-SJS nor Garrison conducted any investigation into the same conduct by public or secular private schools.

129.    On information and belief, several teams within the CAPS league also utilized equipment, uniforms, and facilities supplied by public or secular private high schools.  Again, neither CIF-SJS nor Garrison investigated or targeted these high school programs for this conduct.

130.    Because no investigation was conducted into the conduct of any school other than CCHS, Ripon Christian, Stone Ridge Christian, and Vacaville Christian, Defendants had no basis to conclude that every other CIF-SJS member school complied with CIF bylaws during the COVID-19 pandemic.

131.    Of the thirteen teams involved in the inaugural CAPS club football league season, CIF-SJS and Garrison investigated only those with a tangible affiliation to a Christian school. Defendants, however, willfully ignored any potential affiliation between public or secular, private schools and the remaining teams in the CAPS league.

132.    This selective enforcement of CIF regulations on Plaintiffs, and other Christian schools, without similar enforcement against public high school violates the Free Exercise Clause.

133.    Therefore, the Court should enter judgment in favor of Plaintiffs and declare that the imposition of sanctions on Plaintiffs violates the Free Exercise Clause of the First Amendment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

134.    Judgment in favor of the Plaintiffs against the Defendants by reason of violations of the First and Fourteenth Amendments to the U.S. Constitution.

135.    Injunctive relief removing all sanctions imposed by the Defendants on the Plaintiffs, including sanctions barring Plaintiffs' from post-season play for the 2022-23 football season.

136.    Award nominal damages to Plaintiffs;

137.    Award actual damages to Plaintiffs;

138.    Award Plaintiffs the costs of this action and reasonable attorney's fees; and

139.    Award such other and further relief as the Court deems equitable and just.

**JURY TRIAL DEMANDED**

1    Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

2  Procedure, of all issues so triable.

3   Date:  April 27, 2022                          Respectfully submitted,

4                                                  By: */s/ David L. Anderson*
5                                                  David L. Anderson (SBN 149604)
                                                   dlanderson@sidley.com
6                                                  SIDLEY AUSTIN LLP
                                                   555 California Street, Suite 2000
7                                                  San Francisco, CA 94104
                                                   Telephone: (415) 772-1200
8                                                  Facsimile: (415) 772-7400

9                                                  Gordon D. Todd*
                                                   gtodd@sidley.com
10                                                 Mackenzi J.S. Ehrett*
                                                   mehrett@sidley.com
11                                                 Alaric R. Smith*
                                                   alaric.smith@sidley.com
12                                                 Aaron P. Haviland*
                                                   ahaviland@sidley.com
13                                                 Matthew H. Simpson*
                                                   msimpson@sidley.com
14                                                 SIDLEY AUSTIN LLP
                                                   1501 K Street, N.W.
15                                                 Washington, D.C. 20005
                                                   Telephone: (202) 736-8000
16                                                 Facsimile: (202) 736-8711

17                                                 Michael H. Porrazzo (SBN 121260)
                                                   mhporrazzo@porrazzolaw.com
18                                                 THE PORRAZZO LAW FIRM
                                                   30212 Tomas, Suite 365
19                                                 Rancho Santa Margarita, CA 92688
                                                   Telephone: (949) 348-7778
20                                                 Facsimile: (949) 209-3514

21                                                 *Attorneys for Plaintiffs CAPITAL CHRISTIAN
                                                   CENTER and CAPITAL CHRISTIAN SCHOOL*

22

23

24

25

26

27

28